THELMA COHEN *et al.*, Indiv. and as Trustees, Plaintiffs-Appellants, v. THE DEPARTMENT OF INSURANCE *et al.*, Defendants-Appellees (Merit Insurance Company *et al.*, Defendants).

Fourth District   No. 4—87—0710

Opinion filed July 28, 1988.

John P. Messina, of Law Office of John P. Messina, of Chicago, and Sorling, Northrup, Hanna, Cullen & Cochran, Ltd., of Springfield (William S. Hanley, of counsel), for appellants.

Neil F. Hartigan, Attorney General, of Springfield (Shawn W. Denney, Solicitor General, and Rita M. Novak, Assistant Attorney General, of Chicago, of counsel), for appellee Department of Insurance.

Michael P. Comiskey, William J. Kelty III, Timothy M. Maggio, and Michael P. Trier, all of Lord, Bissell & Brook, of Chicago, and Steven Nardulli, of Stratton, Dobbs, Nardulli & Lestikow, of Springfield, for appellee Jerome Stern.

JUSTICE SPITZ delivered the opinion of the court:

In 1986, defendant Jerome H. Stern sought approval from the defendant Illinois Department of Insurance to acquire a controlling interest in Merit Insurance Company. Thereafter, the Department of Insurance appointed a hearing officer to analyze Stern's application and report proposed findings of fact and conclusions of law. Following a four-day evidentiary hearing, the hearing officer recommended that the proposed acquisition be approved. The Director of the Department of Insurance (Director) then conducted an independent review of the administrative record, adopted the hearing officer's report in its entirety and approved the acquisition by Stern. The plaintiffs, Thelma and Stuart Cohen, were shareholders in Merit Insurance Company and had participated in the administrative hearing, opposing Stern's acquisition. Following the ruling by the Department, the Cohens filed a complaint in administrative review in the circuit court of Sangamon County. Upon consideration of the administrative record and the parties' briefs and arguments, the circuit court affirmed the Director's decision. The Cohens now appeal arguing that the findings of the Director of Insurance regarding Stern's financial situation and integrity are against the manifest weight of the evidence and that the Department of Insurance abused its discretion in assessing one-half of the

costs of the hearing against them. For the reasons that follow, we affirm.

The record shows that Merit Insurance Company (insurance company) is an Illinois domestic stock insurance company, wholly owned by a holding company, Merit Financial Corporation (holding company). Prior to the closing of the instant acquisition, the holding company was owned or controlled in the following percentages by: the Cohen family—40% interest; the Brody family—40% interest; and Jerome H. Stern—20% interest. Stern was hired by Harold Cohen on November 30, 1965, to serve as president and chief executive officer of the insurance company. For 20 years thereafter, the insurance company's directors voted to retain Stern as president.

In late 1984, Stern approached the Brodys concerning the purchase of their 40% interest in the holding company. Then in 1985, Stern instituted proceedings for the approval of his purchase of the Brodys' stock as the purchase would have given Stern a controlling interest in the insurance company. On September 25, 1985, Stern filed a statutorily required disclosure statement concerning his proposed acquisition (1985 Form A) with the Illinois Department of Insurance (Department). (See Ill. Rev. Stat. 1985, ch. 73, par. 743.1 *et seq.*) Stern proposed to purchase the Brodys' interest in the holding company and its affiliates for $1,840,000, financed by a loan from American National Bank of Chicago. The loan was for a term of one year and was subject to renewal at the bank's discretion. The Cohens subsequently raised objections to the proposed acquisition.

On October 25, 1985, the Department issued a notice alleging that Stern's 1985 Form A statement failed to demonstrate that he met the standards in section 131.8 of the Illinois Insurance Code (Code) (Ill. Rev. Stat. 1985, ch. 73, par. 743.8(1)), in that "there [was] a lack of information regarding [Stern's] financial condition, specifically: (1) the source of funds for repayment of the purchase loan and attendant interest payments." The Director issued a notice of public hearing and appointed a hearing officer to conduct an evidentiary hearing on matters raised by Stern's 1985 Form A and the Cohens' objections. The hearing commenced on November 20, 1985, and lasted three days. As shareholders in the holding company who had received notice of the hearing, the Cohens were allowed to participate at the hearing. On December 3, 1985, the hearing officer recommended that the acquisition be disapproved, finding, among other things, that Stern had failed to prove that he had the financial means to repay the purchase loan. On December 20, 1985, the Director adopted the hearing officer's findings of fact and conclusions of law and issued an order dis-

approving Stern's proposed acquisition. The Director's chief objection to Stern's proposed acquisition was the one-year term of the loan Stern had intended to use to finance the transaction. Stern took no appeal from this order.

On October 9, 1986, Stern obtained a commitment from American National Bank of Chicago for a six-year loan in the amount of $1,900,000, to finance the purchase of the Brodys' stock. Then on October 16, 1986, Stern filed a second Form A disclosure statement (1986 Form A) with the Department. In his 1986 Form A, Stern proposed to buy the Brodys' stock for $1,800,000, financed by the loan from American National Bank. Included with the 1986 Form A were financial statements dated October 7, 1986, which had been prepared by Stern's personal accountant. These schedules included: (1) a statement of Stern's financial condition as of August 31, 1986, which disclosed a net worth of $1,002,873; (2) forecasted statements of Stern's financial condition covering the six-year period of the purchase loan; and (3) projected personal cash flow schedules also covering the period of the loan. These schedules were submitted in an attempt to demonstrate that Stern would be able to repay the purchase loan from his personal income and "that no funds of the [insurance company would] be required to repay the loan." These schedules did not reflect a September 29, 1986, investment by Stern in a company called Computer Leasing, Inc. (CLI). According to Stern, at the time of the CLI investment, his accountants had concluded most of the preparation of the financial statements. Shortly after making the investment, Stern consulted the Deputy Director of the division that would review his 1986 Form A. According to Stern, the Deputy Director had no objection to the filing of Stern's financial statements in an unchanged form.

The Cohens again filed objections to the acquisition. On December 2, 1986, the Director issued a notice of public hearing on Stern's 1986 Form A which alleged that the form contained insufficient information to determine whether Stern met the financial and ethical standards set by the Code. The hearing officer that had presided over the 1985 administrative hearing was again appointed. An evidentiary hearing then commenced on December 15, 1986, and lasted four days. The presentation of Stern's case in chief lasted 3½ days and consisted of testimony from Stern, the banker who approved the purchase loan, the accountant who had prepared the October 7, 1986, schedules, the insurance company's outside auditor, and a character witness. The Cohens then called Stern as their only witness. Stern testified regarding the CLI investment. He discussed the nature of the investment, the date he was first approached about the invest-

ment, the date the investment was made and the identity of the parties who advised him of the benefits of such an investment. He also provided a copy of its prospectus. Further, he discussed the financial commitments connected with the CLI investment and the debt of $1,651,220 incurred as a result of the investment. Stern explained that he entered into the CLI investment because, based on his personal experience with a similar computer leasing venture, it was likely that CLI's business would prove profitable. He further stated that the CLI investment was attractive because the investment's general partner, Westinghouse Credit Corporation, insulated investors from liability.

On December 29, 1986, the hearing officer entered his findings of fact, conclusions of law and recommendation. The findings and conclusions will be discussed in relation to the issues presented. The hearing officer determined Stern had demonstrated that the proposed acquisition complied with the requirements of sections 131.8(1)(a), (1)(b), (1)(c), (1)(d), and (1)(e), of the Code (Ill. Rev. Stat. 1985, ch. 73, pars. 743.8(1)(a), (1)(b), (1)(c), (1)(d), (1)(e)) and therefore recommended that the proposed acquisition be approved.

On December 30, 1986, the Director issued an order indicating that he independently reviewed the administrative record, and he adopted the hearing officer's findings of fact, conclusions of law and recommendation that Stern's proposed acquisition be approved. In addition, the Director assessed one-half of the costs of the hearing against Stern and the other one-half against the Cohens. The Director assessed the fees incurred by the hearing officer prior to December 1, 1986, against Stern only. Thereafter, Stern closed the transaction with the Brodys and acquired a controlling interest in the insurance company.

On February 3, 1987, the Cohens filed a complaint for administrative review in the circuit court of Sangamon County alleging that their due process rights had been violated by the Director's decision. In response, Stern filed a motion to dismiss arguing that the Cohens' complaint failed to state a cause of action. Thereafter, the Cohens filed a first-amended complaint which abandoned the due process claim and alleged, in part, that the Director's assessments of Stern's financial condition and personal integrity were contrary to the manifest weight of the evidence. After hearing argument and reviewing the parties' briefs and the administrative record, the trial court affirmed the Director's decision in its entirety. The Cohens filed a timely notice of appeal.

The Cohens first contend that the hearing officer's finding, that

Stern's financial condition would not jeopardize the insurance company's financial stability, was against the manifest weight of the evidence. The Cohens argue that there was no competent evidence in the record that any of Stern's debts were offset by the alleged tax benefits of the CLI investment. The Cohens maintain that the record showed "unequivocally" that the CLI investment had a substantial negative effect on Stern's cash flow, that a negative cash flow would cause Stern to default on the acquisition loan and that such a default would jeopardize the insurance company's financial stability.

Defendants Stern and the Department of Insurance contend the Director's findings, that the net effect of Stern's investment in CLI would be positive and that Stern's financial condition would not jeopardize either the insurance company or its policyholders, are supported by the record. Defendants first contend that there is a substantial amount of uncontradicted evidence supporting the Director's conclusion that the CLI investment would have a positive effect on Stern's financial situation. Defendants maintain that there were at least five categories of evidence admitted at the hearing concerning the CLI investment which support the hearing officer's determination. Defendants refer to CLI's prospectus, Stern's testimony evaluating the profitability of the investment, testimony demonstrating that CLI's general partner was Westinghouse Credit Corporation, cash flow and tax benefits projections and other testimony concerning the beneficial tax and cash flow consequences of the investment. Defendants also contend that Stern's sophistication in business affairs, his training in law and accounting, and his personal experience with the computer leasing industry and with tax planning investments generally make him qualified to evaluate the CLI investment.

Next, defendants contend that even if this court finds that both the Director and the circuit court erred in assessing the probable effect of Stern's CLI investment, the record nevertheless supports the hearing officer's determination that Stern's overall financial condition would not jeopardize either the insurance company or its policyholders. Defendants assert that the evidence concerning CLI comprises only a small part of the 4,700-page record, and the findings of fact pertaining to CLI are only two of the 56 separate findings made by the hearing officer. Defendants argue that the Department's ultimate decision reflects all of the evidence presented and all of the findings and that it would be improper to disturb it based upon the resolution of a single issue like CLI.

■ Section 131.27 of the Code (Ill. Rev. Stat. 1985, ch. 73, par. 743.27) provides in relevant part:

"The Administrative Review Law, as now or hereafter amended, and the rules adopted pursuant thereto, applies to and governs all proceedings for review of final administrative decisions of the Director provided for in this Section."

A court's scope of review of an administrative agency's decision is set forth in section 3—110 of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 3—110) as follows:

"Every action to review any final administrative decision shall be heard and determined by the court with all convenient speed. The hearing and determination shall extend to all questions of law and of fact presented by the entire record before the court. No new or additional evidence in support of or in opposition to any finding, order, determination or decision of the administrative agency shall be heard by the court. The findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct."

A reviewing court cannot reweigh the evidence, make independent determinations of the facts or substitute its judgment for that of the agency even if it believes that the opposite conclusion might be reasonable. (*Jackson v. Board of Review* (1985), 105 Ill. 2d 501, 475 N.E.2d 879; *General Electric Co. v. Illinois Fair Employment Practices Comm'n* (1976), 38 Ill. App. 3d 967, 349 N.E.2d 553; *Okino v. Department of Corrections* (1980), 84 Ill. App. 3d 1084, 405 N.E.2d 1369.) Its function is limited to ascertaining whether the administrative agency's findings and decision are against the manifest weight of the evidence. (*Jackson*, 105 Ill. 2d at 513, 475 N.E.2d at 885; *Nendza v. Board of Review* (1982), 105 Ill. App. 3d 437, 434 N.E.2d 470.) To reverse an agency's decision as against the manifest weight of the evidence, a court must conclude that " 'all reasonable and unbiased persons, acting within the limits prescribed by the law and drawing all inferences in support of the findings, would agree that the finding is erroneous' [citation], and that the opposite conclusion is clearly evident." (*O'Boyle v. Personnel Board* (1983), 119 Ill. App. 3d 648, 653, 456 N.E.2d 998, 1002.) It is not sufficient that there are "[m]ere conflicts in testimony" (*Altman v. Board of Fire & Police Commissioners* (1982), 110 Ill. App. 3d 282, 284, 442 N.E.2d 305, 306) or that an opposite conclusion might be reasonable (*Knop v. Department of Registration & Education* (1981), 96 Ill. App. 3d 1067, 421 N.E.2d 1091).

Insurance holding-company systems, such as the one in the case at bar, are governed by the provisions of article VIII½ of the Code (Ill. Rev. Stat. 1985, ch. 73, par. 743.1 *et seq.*). Section 131.4 of the Code (Ill. Rev. Stat. 1985, ch. 73, par. 743.4) provides in part:

"No person other than the issuer may make a tender for or a request or invitation for tenders of, or enter into an agreement to exchange securities for or acquire in the open market, or otherwise, any voting security of a domestic company or acquire policyholders' proxies of a domestic company for consideration if, after the consummation thereof, that person would, directly or indirectly, (or by conversion or by exercise of any right to acquire) be in control of the company, and no person may enter into an agreement to merge or consolidate with or otherwise to acquire control of a domestic company, unless the offer, request, invitation, or agreement is conditioned on receiving the approval of the Director based on Section 131.8 of this Article and no such acquisition of control or a merger with a domestic company may be consummated unless the Director has approved the transaction or granted an exemption. ***

\* \* \*

The purpose of this Section is to afford to the Director the opportunity to review acquisitions in order to determine whether or not the acquisition would be adverse to the interests of the existing and future policy-holders of the company."

Section 131.5 of the Code (Ill. Rev. Stat. 1985, ch. 73, par. 743.5) provides that in order to seek approval of the Director, the applicant must file a statement with the Director. Further, section 131.5 sets forth the information that the statement must contain. Section 131.8 of the Code (Ill. Rev. Stat. 1985, ch. 73, par. 743.8) then provides in relevant part:

"(1) After the statement required by Section 131.5 has been filed, the Director must disapprove any merger, consolidation or other acquisition of control referred to in Section 131.4 unless the acquiring party demonstrates to the Director that:

\* \* \*

(c) the financial condition of any acquiring party is such as to not jeopardize the financial stability of the domestic company or not jeopardize the interests of its policyholders."

■ In view of the scope of judicial review, the defendants' contentions are persuasive. The parties' arguments center on Stern's CLI investment. With regard to that investment the hearing officer found:

"39. Stern's investment on September 29, 1986 in six units of Computer Leasing, Inc. ("CLI") is not reflected in the financial information filed by Stern as part of his Form A package (Stern Exhibit No. 1), but it is undisputed that Stern orally advised the Insurance Department's Deputy Director in charge of

the Property and Casualty Division of the fact of the investment and that it would not appear in the financial information Stern was preparing to file.

40. Based upon the evidence admitted, it appears probable that the net effect of Stern's investment in CLI, on a cash flow basis, will be positive."

These findings, which were affirmed by both the Director and the circuit court after independent reviews of the administrative record, are supported by the record. As previously discussed, the weight of the evidence and the credibility of the witnesses are matters within the province of the administrative agency. (*Jackson v. Board of Review* (1985), 105 Ill. 2d 501, 475 N.E.2d 879.) If there is some competent evidence in the record sufficient to support the agency's conclusion, it should be upheld. (*Greene v. Board of Election Commissioners* (1983), 112 Ill. App. 3d 862, 445 N.E.2d 1337.) There is competent evidence in the instant record to support the hearing officer's finding that the net effect of Stern's CLI investment would be positive. The record from the administrative hearing in this matter reveals that Stern explained the nature of the investment by providing each party and the hearing officer with copies of the investment's prospectus. Based on his personal experience with a certain partnership engaged in the same business as CLI, Stern testified to the likelihood that CLI's business would be profitable. Testimony was presented demonstrating that the identity of CLI's general partner was Westinghouse Credit Corporation, that this general partner was primarily liable on the recourse notes signed by Stern, and circumstances were discussed which would have to exist before individual investors could be held liable on the recourse notes. Further, copies of CLI's projections regarding expected cash flow and tax benefits resulting from that investment were admitted into evidence as a foundation for Stern's evaluation of the CLI investment. Additionally, testimony was presented regarding the beneficial tax and cash flow consequences which Stern expected from the CLI investment. As this evidence supports the findings relating to the positive effect of the CLI investment, they should be upheld.

Moreover, a review of the record, under the principles of administrative review outlined above, does not warrant reversal of the hearing officer's remaining findings and conclusion that Stern's overall financial condition would not jeopardize the financial stability of the insurance company or the interests of its policyholders. The hearing officer's findings reflect his assessment of not only the CLI investment, but also Stern's current and projected financial condition as a

whole, based upon a number of factors. For instance, the hearing officer assessed the ramifications of financing the proposed acquisition, including the length of the term of the purchase loan and its conditions, the repayment schedule and interest rate, the collateral involved, and possible contingencies. He assessed the sources of income upon which Stern would rely in order to repay the loan. He assessed the existence and terms of the insurance company's quota-share reinsurance agreement. He evaluated the insurance company's current and projected surplus considering possible penalties. The hearing officer also assessed the probable volume of annual premiums the insurance company would be able to write during the period of the purchase loan. He assessed the ramifications, including projected expenses and income, of the insurance company's existing managing-agency agreement with an affiliated company. He also evaluated and modified Stern's cash flow projections. Further, the hearing officer assessed Stern's tax considerations and a possible adverse judgment against Stern which might arise from a pending action. Finally, he assessed Stern's assets and projected net income during the period of the loan and found:

> "47. After the acquisition, it appears probable that Stern will have or receive funds sufficient to (a) satisfy scheduled principal and interest payments on his personal obligations; (b) pay for his ordinary and necessary personal expenditures, including taxes; and (c) pay both required principal and interest on the bank loan used to finance the acquisition of [the insurance company].
>
> 48. Based upon the foregoing findings and the record, Stern's financial condition is such as to not jeopardize the financial stability of [the insurance company or the interests of its policyholders]."

All of the aforementioned findings are derived from evidence presented at the administrative hearing in this cause. These findings are not only supported by the record but demonstrate the application of expert administrative judgment as to the evidentiary facts. As stated by the supreme court in *Skokie Federal Savings & Loan Association v. Becker* (1962), 26 Ill. 2d 76, 82, 185 N.E.2d 861, 864-65:

> "It should be noted that the findings required by the statute and made by the Director are not simple findings of readily ascertainable facts, but represent the application of expert administrative judgment to the evidentiary facts. *** They involve matters of judgment and policy. Under such circumstances, a court may not substitute its judgment for that of the adminis-

trative agency and should not reverse the order of the administrative agency unless the judgment of the agency is without substantial support in the record."

In the case at bar, the conclusion that Stern's financial condition would not jeopardize the insurance company or its policyholders is supported by the record and will not be disturbed.

■ The Cohens next contend that the Director's findings regarding Stern's integrity are against the manifest weight of the evidence. The Cohens contend the Director erred in finding that Stern had the integrity required of those who would control a domestic insurance company. The Cohens argue that Stern's filing of elaborate financial forecasts and projections that omitted all reference to the CLI investment was a knowing and wilful act of deceit and that permitting him to retain control of the insurance company would not be in the best interest of its policyholders and the insurance-buying public. Defendants assert that the Cohens do not take issue with any of the evidence recited in the hearing officer's findings, but argue only that Stern has demonstrated a lack of integrity by concealing the CLI investment from the Department of Insurance. Defendants contend that this argument ignores the express findings on this issue and all of the evidence relied upon by the hearing officer in making the findings.

Section 131.8(1)(e) of the Code (Ill. Rev. Stat. 1985, ch. 73, par. 743.8(1)(e)) provides in relevant part:

"(1) After the statement required by Section 131.5 has been filed, the Director must disapprove any merger, consolidation or other acquisition of control referred to in Section 131.4 unless the acquiring party demonstrates to the Director that:

\* \* \*

(e) the competence, experience and integrity of those persons who would control the operation of the domestic company are such that it would be in the best interests of policyholders of such company and of the insurance buying public to permit the merger, consolidation or other acquisition of control."

An examination of the hearing officer's findings on the issue of Stern's integrity together with a review of the administrative record reveals that the Cohens' argument is unpersuasive. In the case at bar, the hearing officer found, *inter alia*:

"53. Stern's integrity is such that permitting him to acquire control of [the insurance company] would be in the best interests of [the insurance company's] policyholders and the insurance-buying public. This finding is based on the testimony of Stern and others regarding his past performance as chief exec-

utive of [the insurance company], upon the testimony of Philip O'Connor, a former Director of the Department of Insurance, and upon the fact that the directors of [the insurance company] elected by the Cohens voted consistently over nearly 20 years to reelect Stern as President of [the insurance company], considered in light of, and along with, all the evidence adduced at the Hearing which bears upon Stern's integrity."

This finding, which was adopted by the Director and affirmed by the circuit court, is supported by the record. As the hearing officer indicated, his finding was based upon testimony presented at the hearing, including that of Stern and Philip O'Connor, former Director of the Department of Insurance. O'Connor testified to Sterns' good reputation in the insurance industry and to his reliability in keeping his commitments. The hearing officer's finding was also based upon evidence demonstrating that the directors of the insurance company, who were elected by the Cohens, had voted consistently over a 20-year period to reelect Stern as president and chairman of the board of directors of the insurance company. Indeed, the record shows that Stern was hired by Harold Cohen on November 30, 1965, to serve as president and chief executive officer of the insurance company. In the 20 years thereafter, the directors, including those elected by the Cohens, voted to retain Stern as the insurance company's president.

Regarding the alleged concealment of the CLI investment the hearing officer found:

"39. Stern's investment on September 29, 1986 in six units of [CLI] is not reflected in the financial information filed by Stern as part of his Form A package (Stern Exhibit No. 1), but it is undisputed that Stern orally advised the Insurance Department's Deputy Director in charge of the Property and Casualty Division of the fact of the investment and that it would not appear in the financial information Stern was preparing to file."

This finding is also supported by the record. The administrative record discloses that shortly after making the CLI investment, Stern contacted Kenneth Smith, Deputy Director in charge of the Property and Casualty Division of the Department of Insurance, the division that would review Stern's 1986 Form A filing. Smith informed Stern that he had no objection to Stern filing the financial statements in an unchanged form. Then at the evidentiary hearing on the matter, Stern testified to all the details of the investment.

Based upon the foregoing, it cannot be said that Stern intentionally concealed the CLI investment. Nor can it be said that the hearing officer's findings or the Director's decision relating to Stern's integ-

rity are against the manifest weight of the evidence. As previously discussed, a reviewing court cannot redetermine the credibility of witnesses nor reweigh the evidence. Rather, its function is to determine whether the administrative agency's decision is against the manifest weight of the evidence. (*Jackson v. Board of Review* (1985), 105 Ill. 2d 501, 475 N.E.2d 879.) Consequently, the Director's decision here, relating to Stern's integrity, should be upheld.

■ Finally, the Cohens contend that the Director of Insurance abused his discretion in assessing one-half of the costs of the hearing against them. The Cohens again point to the alleged deception surrounding the CLI investment and argue that all costs of the proceeding should have been assessed against Stern. Defendants argue that the Director's assessment of costs was proper.

In the case at bar, the Director ordered that the fees incurred by the hearing officer prior to December 1, 1986, be paid entirely by Stern personally. Further, the Director assessed one-half of the costs of the hearing against Stern and the remaining one-half was assessed against the Cohens. Section 408(5)(a) of the Code (Ill. Rev. Stat. 1985, ch. 73, par. 1020(5)(a)) provides:

> "The costs incurred by the Department of Insurance in conducting any hearing authorized by law shall be assessed against the parties to the hearing in such proportion as the Director of Insurance may determine upon consideration of all relevant circumstances including: (1) the nature of the hearing; (2) whether the hearing was instigated by, or for the benefit of a particular party or parties; (3) whether there is a successful party on the merits of the proceeding; and (4) the relative levels of participation by the parties."

Hence, it was within the Director's discretion to assess costs against the parties pursuant to the guidelines set forth in section 408(5)(a). (Ill. Rev. Stat. 1985, ch. 73, par. 1020(5)(a).) The record demonstrates that the Cohens: (1) had a significant interest in the proceedings; (2) filed objections to the acquisition; (3) actively participated at the evidentiary hearing; and (4) did not prevail on the merits of the proceeding. Thus, it cannot be said the Director abused his discretion in assessing one-half of the costs of the hearing against the Cohens.

For the foregoing reasons, the judgment of the circuit court of Sangamon County is affirmed.

Affirmed.

LUND and KNECHT, JJ., concur.