590

GARY K. RUNNING, Plaintiff-Appellee, v. STATE BANKING BOARD OF ILLINOIS *et al.*, Defendants-Appellants (Tri-State Bank and Trust Company of East Dubuque, Illinois, Defendant).

Fourth District   No. 4—92—0347

Opinion filed November 25, 1992.—Rehearing denied December 23, 1992.

Roland W. Burris, Attorney General, of Springfield, and Bruce J. Baker, of Office of Illinois Commissioner of Banks and Trust Companies, and Sidley & Austin, both of Chicago (William F. Conlon, Constantine L. Trela, and David R. Stewart, Special Assistant Attorneys General, of counsel), for appellants.

Grady W. Holley, of Holley Law Office, of Springfield, for appellee.

JUSTICE LUND delivered the opinion of the court:

The State Commissioner of Banks (Commissioner) ordered Gary K. Running (Running) removed from positions with the Tri-State Bank and Trust Company (Tri-State) located in East Dubuque, Illinois. A hearing followed before a hearing officer and, based upon the hearing officer's finding, the State Banking Board of Illinois

(Banking Board) concurred in the Commissioner's actions. Running sought administrative review before the circuit court of Sangamon County and that court reversed, finding the Banking Board's decision was against the manifest weight of the evidence. The Commissioner and the Banking Board have appealed the circuit court's decision to this court. We reverse.

Running had a banking background—as an examiner, then as a control owner of a Wisconsin bank. He purchased control of Tri-State in 1970. He became president and chairman of its board of directors a year later and remained in those positions until he was removed by the Commissioner in February 1989.

The charges by the Commissioner revolved around two transactions. The first, beginning in 1982, involved loans made to two individuals for Arabian horse investments. The second, in 1988, was far less complicated and involved the use of funds in Tri-State's correspondent bank account with First Wisconsin National Bank of Milwaukee (First Wisconsin) to pay Running's personal loan and the loan of his holding company to First Wisconsin.

Running declared personal bankruptcy in late 1988, and his holding company followed suit shortly thereafter. Following an examination of Tri-State in January 1989, the Commissioner's order of removal was issued and Running was locked out of the bank.

## I. THE CHARGES FOUND PROVED IN ADMINISTRATIVE FORUM

The Commissioner charged certain violations by Running in the order of removal. The following charges were ultimately sustained by the Banking Board following issuance of the hearing officer's report:

(1) Running had made certain statements to personnel from the Commissioner's office misrepresenting his interest in some horses for which Tri-State was paying expenses and this misrepresentation violated section 49 of the Illinois Banking Act (Act) (Ill. Rev. Stat. 1987, ch. 17, par. 361);

(2) Running had received a horse in January 1983 from Alexander Robertson as a gift in appreciation of Running making certain loans to him, in violation of section 215 of title 18 of the United States Code (see 18 U.S.C. §215 (1988)), which prohibits an officer or director of a bank whose deposits are insured by the Federal Deposit Insurance Corporation (FDIC) from receiving anything of value from any person or entity for, or in connection with, any transaction or business of the bank;

(3) Running acted in an unsafe and unsound manner with respect to loans made by Tri-State to Robertson in December 1982 for $85,000 and $20,000, in August 1983 for $37,500, and in September 1983 for $40,650, knowing that Robertson was in poor financial condition and that the likelihood was low that the loans would be paid back;

(4) Running acted in an unsafe and unsound manner by engaging in business ventures with Robertson and James Mashburn, debtors of Tri-State, without full disclosure to all members of Tri-State's board of directors, thus creating an actual conflict of interest or, at the least, the appearance of impropriety;

(5) Running violated section 656 of title 18 of the United States Code (see 18 U.S.C. §656 (1988)) by causing Tri-State to pay some $22,000 of expenses incurred as the result of litigation over the aborted sale of Aza Dazal, one of the horses owned by Robertson, as those expenses should have been charged to the Aza Destiny syndicate and paid by it;

(6) Running also violated that same Federal statute in misapplying proceeds of the sale of Aza Destiny, sold in October 1984 for a net of $200,000—$106,913.77 of which was pocketed by Running to repay his investment in the Aza Destiny syndication—after repaying principal and interest to Tri-State on the $85,000 Robertson loan; the Commissioner charged that Running should have applied the full amount of sale proceeds to Robertson's other loans with Tri-State; and

(7) Running violated that same Federal statute (see 18 U.S.C. §656 (1988)) by converting $6,583.20 from one of Tri-State's correspondent accounts and applying the money for payment of interest on a debt owed personally by Running or his holding company.

There were other charges either dropped by the Commissioner during the course of the hearing before the hearing officer, or which the Banking Board later found not proved. The charges detailed above were found, by the Banking Board, to have been proved by the Commissioner by clear and convincing evidence.

These charges were the subject of eight days of hearings in 1989 before a hearing officer appointed by the Banking Board. The evidence may be briefly summarized as follows.

### A. *Loans To Alexander Robertson*

Robertson was an attorney licensed in California and Hawaii. He also owned Robertson's Arabians, a horse ranch in Oregon. The transactions in question occurred in 1982 and 1983. In 1984,

Robertson was disbarred in Hawaii and, in 1986, he was disbarred in California. He was convicted on three counts of theft by deception in 1988 involving borrowing funds from clients and not repaying them. He served four months in prison.

Robertson became acquainted with Running through his representation of Running's wife in a workers' compensation case. He approached Running in late November 1982 and asked him to become a partner with him in the syndication of an Arabian stallion named Aza Destiny (Destiny). The syndication would involve selling ownership interests in Destiny and income generated from the horse, primarily from selling breeding rights. Robertson was purchasing Destiny on contract from Glenn and Mary Ash for $250,000. He had fallen behind in his payments, and the Ashes had repossessed Destiny for Robertson's failure to make an $85,000 payment. Prior to that, Robertson had paid the Ashes some $70,000 or $80,000 in contract payments and expended money in promoting the horse. Robertson told Running he believed they could syndicate Destiny for $3.5 million. Running knew nothing about the Arabian horse industry and, indeed, was not familiar with any aspect of the horse industry.

After consultation with others who knew Robertson and Destiny, Running agreed to participate in the venture. He advised Robertson to draft a demand promissory note for $85,000, payable to Tri-State. He also told Robertson to send a financial statement. Robertson had no experience in drafting such notes, but he prepared the note, signed it, and sent it to Tri-State. Although the note committed Robertson to execute security documents on Destiny, he testified that he was never asked to do so. He also sent his financial statement dated September 1982, showing a net worth of $1.8 million. Destiny was listed as an asset worth $1 million. Robertson's income from his law practice had dropped significantly and he listed over $700,000 in debts, including a debt of $11,500 to a Hawaii bank listed as "loan due." Robertson advised Running that he was in an adverse financial situation and described his problem as a poor cash flow. Running did not perform a credit check on Robertson. Had he done so, he would have discovered that Robertson had a history of late payments. Two of the banks in Hawaii with which Robertson had done business would no longer lend him unsecured funds or funds secured by horses. In addition, Robertson had past-due debts within the Arabian horse industry and his credit reputation was not good.

Destiny was regained from the Ashes at a cost of $185,000. Running contributed a note for $100,000, backed by a letter of credit from First Wisconsin. At the closing, which took place in the State of Washington, Running wrote a check to the Ashes for $85,000 on his personal account at Tri-State, despite the fact that his account contained less than $6,000 at that time. When the check came through the bank, Terri Running (Terri), cashier of Tri-State and Running's daughter, deposited the $85,000 Robertson loan proceeds into Running's account to cover the check.

While in Washington, Robertson asked Running for a $20,000 Tri-State loan to pay some of his debts—one to the estate of a man who had a security interest in Aza Dazal (Dazal), a mare of Destiny's progeny, and one to an Arabian horse industry magazine. Robertson represented to Running that payment of these debts was necessary for the successful syndication of Destiny. Running agreed to the loan and told Robertson to have an attorney prepare a note. Robertson agreed to give a security interest in Sarinade, a mare and another of Destiny's progeny owned by Robertson. Robertson represented to Running that Sarinade was worth more than $20,000. Running took no action to confirm this valuation, other than to secure the opinion of James Taasaas, Destiny's trainer, that Sarinade was a good mare. Tri-State's security interest in Sarinade was perfected by filing a form under the Uniform Commercial Code (UCC), a UCC-1 form, in Oregon. It was subsequently discovered that Robertson did not use the loan proceeds to pay these debts and Running ultimately paid them himself.

Robertson testified that he and his wife gave a horse named Aza Springtime (Springtime), another progeny of Destiny, to Running and his wife in appreciation for the loans from Tri-State and Running's financial contribution to get back Destiny. Since they did not have any cash, they sent the horse as a gift. Running disputed this in his testimony, saying that Springtime was given to him by Robertson to equalize the parties' contributions to the syndicate venture. The agreement entered into by Running and Robertson stated that they each would be coowners of Destiny and share equally in the expenses. It also provided that Robertson's $85,000 loan and Running's $100,000 contribution would be paid first from any income from the syndication. The agreement was silent as to reimbursement to Robertson for his alleged contribution of Springtime to the syndicate.

Running and Terri (also on the loan committee and the board of directors of Tri-State) both testified that the loan committee infor-

mally approved the two loans prior to their being made. This was done by telephone from Washington. The procedure followed at Tri-State was to have the board of directors approve the loans, after the fact, at monthly meetings. That procedure was followed here. Running and his daughter testified that Running told the loan committee and the board of directors about his joint venture with Robertson. However, Terri did not recall if Running told the loan committee that Destiny had already been repossessed. Barbara Kramer, vice-president and director of Tri-State, testified that she could not remember any specific discussion of the two Robertson loans, nor did she recall whether she and other board members were advised by Running in 1982 and 1983 that Robertson was in an adverse financial position.

When the $20,000 loan came due in May 1983, Robertson did not have the money to pay on either principal or interest. The loan was renewed and the interest capitalized. Tri-State purported to take a security interest in Dazal and Aza Tango (Tango), another of Destiny's offspring, as additional security.

Running testified that he paid virtually all the syndication expenses. Robertson did not have the cash to pay his share. In August 1983, after Running told him he would have to start paying his share of expenses, Robertson received another loan from Tri-State in the amount of $37,500. Running admitted that by this time he was convinced that Robertson was a "pathological liar." Despite this assessment, Tri-State continued to loan money to Robertson. This amount was deposited in the syndicate checking account at Tri-State. No additional credit checks were done on Robertson prior to making this loan. Terri testified that this loan "probably" was approved beforehand by the loan committee and after the fact by the board of directors.

Terri Running testified as to the manner in which Tri-State sought to perfect its security interests in Destiny and Dazal. No UCC-1 filings were made on these horses. A UCC financing statement was finally obtained on Tango in October 1983. Terri testified that she became concerned about perfecting Tri-State's interest because the horses were being moved from State to State. She sought advice from the Arabian horse registry and was told that although each horse had a certificate of registration with the registry, it was not a title and Tri-State's lien could not be shown thereon. She placed the name of Tri-Banco on all the certificates as transferee, conjecturing that this would perfect Tri-State's interest. Tri-Banco is the nominee name for Tri-State Bancorporation, Inc., which ex-

hibits admitted into evidence show is the name of the holding company solely owned by Running. That holding company was majority shareholder in Tri-State. The name was also used by Tri-State as its nominee name on its investment securities.

In September 1983, Tri-State made a fourth loan to Robertson, this one for $40,650. This amount was used to pay breeding fees for Dazal. By this time, the Destiny syndicate was not going well and it was decided to sell Dazal at a large horse sale in Arizona to enhance the value of Destiny. The sales price of Dazal would be increased if breeding rights to stallions from a prestigious breeder were purchased and sold with Dazal. No additional credit checks were done on Robertson, despite Running's misgivings about Robertson's honesty. No part of the $85,000 or $20,000 loan had been paid at the time of this last loan. Running testified he was looking strictly to the collateral to repay the loans, rather than believing Robertson would repay them himself. He believed Tri-State was in a good collateral position with the various horses.

In December 1983, Robertson filed bankruptcy proceedings. He tried to stop the sale of Dazal because of his unhappiness with the manner in which it was handled. Running and his wife had been listed as owners and consignors, supposedly because of a feeling that it would be detrimental to the sale to have Robertson listed as the owner. Robertson did not have a good reputation in the Arabian horse industry. Running had signed, on behalf of Tri-State, the agreement with the auction house to sell Dazal. Although an offer was received for Dazal, the sale did not go through because Robertson commenced litigation in his bankruptcy proceeding to stop the sale. The auction house sued Running and Tri-State for its commission on the aborted sale and its attorney fees. A judgment was entered in Arizona against both Running and Tri-State. On appeal, the judgment against Running was reversed, since he had signed only on behalf of Tri-State and not individually. Tri-State paid the judgment and Running's attorney fees incurred in his defense. That amount was charged by Tri-State against the Robertson loans as a collection expense.

With the Destiny syndicate in shreds, Destiny was sold in October 1984 for a net of $200,000. A check for that amount was made payable to Tri-Banco. Of that amount, Tri-State retained $93,355.89 in payment of principal and interest on the $85,000 Robertson loan. The balance of $106,644.11 was deposited into Running's personal checking account, apparently for reimbursement of his contributions to the Destiny syndicate.

Tango was sold on contract, but the buyer defaulted and Tri-State repossessed the horse. This sale had been arranged by a man named James Mashburn, whom Running and Robertson had previously hired to manage the Destiny syndicate. Mashburn received the $11,200 down payment on Tango's sale. He paid $7,160 of this amount to Tri-State, but it was deposited to Running's personal account. Running could offer no explanation for this. He testified he did not know whether Tri-State received any of the proceeds from Tango's sale prior to the buyer's default. Dazal had not been sold as of the date of the hearings before the hearing officer. Tri-State paid $106,000 in various expenses connected with these horses as collateral for the loans, the litigation in Arizona, and in Robertson's bankruptcy. It was undisputed that the horses had little value as of the date of the hearing.

Robertson had written a letter to the Commissioner in 1985, detailing these activities and requesting that the Commissioner take some action against Running. The Commissioner declined to act on this information. Tri-State underwent an examination in November 1988. After the Commissioner became aware of Running's bankruptcy, examiners were sent back to Tri-State in January 1989. Running placed a telephone call to first deputy commissioner Treston to inquire as to why the examiners had returned to Tri-State. He was told that they were looking for some horse loans. Running was asked whether he had a direct relationship with any of the horses that the examiners were checking on, and he replied that he had no relationship whatsoever. No horses were mentioned by name during this conversation.

The Commissioner put Tri-State's losses on the Robertson loans at $221,105.45, including $114,191.68 in loan losses and $106,913.77 in expenses relating to the collateral for the loans and attorney fees incurred in the Arizona and bankruptcy litigation.

### B. *The Horse Abaskus and the James Mashburn Loan*

Evidence concerning these transactions came from the conflicting testimony of Running and Terri. In November 1983, Tri-State made a loan to Mashburn for $75,000 to enable him to purchase a stallion named Abaskus. The cost of the horse was $100,000, with Mashburn putting up a $25,000 down payment. The horse was to act as collateral for the loan, but no UCC filing was made. As with the other horses, Terri put Tri-Banco's name as transferee on Abaskus' registration certificate and sent it to the Arabian horse registry.

On the date the loan to Mashburn was made, a checking account was set up at Tri-State in the name of Mashburn and Running Arabians. Running and Mashburn were the signatories on the account. When Terri sent Mashburn the loan proceeds, she also sent a $12,500 personal check from Running. She testified that this was for expenses Running either did, or would, owe Mashburn on the Destiny syndicate. However, she also admitted the Destiny syndicate checking account existing at Tri-State had been established to take care of paying such expenses and that Mashburn had been paid numerous times from that account. There were not sufficient funds in that account to make the $12,500 payment.

Running denied he had any personal interest in Abaskus. He stated the loan had been approved by the loan committee and the board of directors. However, he claimed he did not know the purpose of the $12,500 payment made from his personal account to Mashburn. He claimed the Mashburn and Running Arabians account had been set up for a tax-shelter venture Mashburn had talked him into joining. Running was sketchy on details of this venture and stated he really did not understand it. He eventually decided that it was a scam and closed the account.

There was an interest payment of $10,003.36 made on the Mashburn loan. Running paid $5,001.68 (exactly one-half) of that amount from his personal account. Terri testified that Running told her there was a dispute between Running and Mashburn as to money allegedly owed by Running to Mashburn on the Destiny syndicate. An agreement was reached, whereby Running paid what he owed Mashburn on the loan rather than paying it directly to Mashburn. However, Running testified it was Terri who told him that Mashburn had demanded money from her for expenses and that it was Terri's idea to apply the money on Mashburn's loan.

Mashburn eventually filed his own bankruptcy proceeding. Tri-State obtained possession of Abaskus. The bank paid expenses to board the horse and market it. Finally, after $10,000 in boarding bills had accumulated, Tri-State gave Abaskus to the stable in satisfaction of the bills. Tri-State charged off the Mashburn loan at a $70,000 loss.

### C. Alleged Use of Tri-State Funds To Pay Running's Debts

Tri-State maintained a correspondent checking account with First Wisconsin. Running and his holding company had loans with that bank. Robert Koch, an official of First Wisconsin, testified that Running, in July 1988, had verbally authorized him to debit Tri-

State's account to make interest payments on Running's personal loans and the holding company's loan with First Wisconsin. A letter from Barbara Kramer confirmed that authorization. Running also wrote to First Wisconsin authorizing that bank to make monthly debits to Tri-State's account for payments on those loans. Debits were also made in September and October 1988, pursuant to Running's verbal authorization. The October debit was $6,583.20. Running reimbursed Tri-State for all debits except the final one in October. A dispute arose between the two banks as to whether that debit should be reversed. The debit was not reversed, and Running finally reimbursed Tri-State in February 1989 when the Commissioner advised Tri-State to straighten out the matter. No interest was paid to Tri-State by Running for his use of the bank's funds.

In his testimony, Running attempted to deny any involvement with instructing First Wisconsin to debit Tri-State's account, despite documentary evidence to the contrary in the form of the July 1988 letter from Running to First Wisconsin, authorizing monthly debits, and letters and a memorandum from Koch, referencing Running's verbal instructions. When confronted with his July 1988 letter, Running finally admitted he had written it "under extreme duress." He then also admitted authorizing a transfer of funds in September 1988.

The hearing officer issued a lengthy report after the conclusion of the hearing. He found the charges set forth in this opinion had been proved by clear and convincing evidence. The Banking Board adopted the hearing officer's findings of fact and issued its own conclusions of law.

### D. *The Banking Board's Decision*

The Banking Board concluded that Running had intentionally misled the Commissioner's personnel with regard to his interest in the horses on which Tri-State had paid expenses, in violation of section 49 of the Act. That section proscribes false statements made with the intent to deceive the Commissioner in the performance of his duties.

The Banking Board also determined that Running violated Federal law (18 U.S.C. §215 (1988)) by receiving Springtime from Robertson as a gift in gratitude for the extension of loans by Tri-State to him.

It was also determined by the Banking Board that Running had engaged in unsafe and unsound practices in conducting the business

of Tri-State and that he violated his fiduciary duty to Tri-State each time he caused Tri-State to make the loans to Robertson by:

(1) causing Tri-State to make loans he would not have made had he himself not been personally involved in the ventures for which the loans were made;

(2) causing Tri-State to make loans that had either a higher than normal or a high risk of nonpayment;

(3) placing his personal interests above those of Tri-State to its detriment in regard to making the $37,500 and $40,650 loans to Robertson and by ensuring that Running could recover some or all of his investment in the Destiny syndicate before Tri-State could recover its loans;

(4) benefiting personally from the Robertson loans on the basis of no security, or security of questionable value, when he knew Robertson was not creditworthy;

(5) committing Tri-State to lend to a financially weak co-venturer while withholding from Tri-State, out of self-interest, his own stronger credit and assets;

(6) not making the Robertson loans conditional on Tri-State obtaining a security interest in 100% of Destiny or collateral of equivalent value;

(7) failing to do a credit check on Robertson before committing Tri-State to loan to him, especially when Running was put on notice of serious questions regarding Robertson's creditworthiness;

(8) not bringing in an independent person to evaluate the prudence of the $37,500 and $40,650 loans to Robertson;

(9) permitting Robertson, the borrower and a lawyer without experience in banking transactions, to do legal work to document the $85,000 loan; and

(10) failing to make full and adequate disclosure to, and obtain prior approval from, Tri-State's board of directors and have the board minutes reflect that Running was a principal beneficiary of the loans, which failure prevented the examiners from determining that these were employee-related or insider loans.

The Banking Board also found that Running had engaged in an unsafe and unsound practice and had violated his fiduciary duty to Tri-State by causing Tri-State to pay the judgment and Running's attorney fees stemming from the Arizona litigation on the Dazal sale, when Tri-State derived no benefit therefrom and when those expenses were properly attributable to the Destiny syndicate. The Banking Board found this was a willful misapplication of Tri-State

funds, in violation of section 656, title 18 of the United States Code (18 U.S.C. §656 (1988)).

The Banking Board also found a misapplication of Tri-State funds in connection with the October 1988 debit of its account with First Wisconsin without reimbursing Tri-State until February 1989 and in failing to pay Tri-State for use of this money.

## II. The Circuit Court's Decision

The circuit court's findings and order in the administrative review action was issued on March 30, 1992. The court stated it used the "manifest weight of the evidence" standard in reviewing the findings of the hearing officer. However, in the course of its order, it is clear that the court in fact reweighed the evidence and made its own determinations as to credibility of the witnesses which were contrary to those of the hearing officer.

It also appears that the court, while purporting to accept the hearing officer's conclusion that the Commissioner had to prove each charge by clear and convincing evidence, deviated from that standard when it stated that the charges must be so convincing as to leave "no reasonable doubt" in the mind of the fact finder that the allegations were proved.

The court found that Robertson's testimony lacked credibility, was entitled to little (if any) weight and, standing by itself, did not establish any of the charges against Running. The court found that Running and his wife were more credible witnesses than Robertson. It also found the circumstantial evidence introduced on many of the charges was of equal weight and did not carry the Commissioner's burden of proof.

It further found that because the $85,000 Robertson loan was ultimately repaid to Tri-State, it could not have been an unsafe and unsound practice to make that loan. Then, in a curious departure from this reasoning, the court declined to find the other three Robertson loans were improvident because they were not repaid. It noted the Commissioner did not attempt to establish that Dazal and Tango did not provide adequate security and that based upon the contract sales price of Tango ($56,000) and the bid received for Dazal ($70,000), those horses did, in fact, have a value adequate to support the loans.

The court also found that Running was not responsible for the haphazard efforts to obtain valid security interests in the various horses because he did not personally handle those transactions. It also found that the Commissioner had failed to offer any evidence

of Running's failure to adequately disclose his personal involvement with Robertson to Tri-State's board of directors. It relied on the testimony of Barbara Kramer and Terri Running to support its conclusion that Running had made adequate disclosure. The hearing officer had placed the burden of production on this issue on Running's shoulders and had found that Running did not carry this burden.

The court found the circumstantial evidence surrounding the question of Running's alleged ownership interest in Abaskus was insufficient to establish that Running had such an interest. The court found it suspicious that Running made what appeared to be 50% of a payment on Mashburn's loan. However, the court stated the inferences to be drawn from that payment were "multiple" and that it could not say the circumstantial evidence left "no reasonable doubt" that Running had an ownership interest in Abaskus.

With respect to debits to Tri-State's First Wisconsin account to apply toward Running's personal debts, the court found there was insufficient evidence that Running never intended to repay Tri-State for the October 1988 debit. In an apparent misunderstanding of the hearing officer's conclusions on this issue, the court noted the hearing officer's statements that the actions by First Wisconsin were not to be criticized and found it was implicit in this statement that the transaction itself was not improper.

The circuit court concluded by saying that while it did not sanction Running's "questionable business practices," it nonetheless found the findings and conclusions of the hearing officer and the adoption thereof by the Banking Board to be contrary to the manifest weight of the evidence.

## III. ANALYSIS

■ Section 48 of the Act provides in part:

"Whenever, in the opinion of the Commissioner, any director, officer, employee, or agent of a State bank shall have violated any law, rule, or order relating to that bank or shall have engaged in an unsafe or unsound practice in conducting the business of that bank, the Commissioner may issue an order of removal." Ill. Rev. Stat. 1991, ch. 17, par. 359(7).

■ The circuit court's jurisdiction and responsibility when sitting in administrative review are limited, as set forth in our opinion in *Cohen v. Department of Insurance* (1988), 173 Ill. App. 3d 363, 369, 527 N.E.2d 581, 585-86, as follows:

"A court's scope of review of an administrative agency's decision is set forth in section 3—110 of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 3—110) as follows:

'Every action to review any final administrative decision shall be heard and determined by the court with all convenient speed. The hearing and determination shall extend to all questions of law and of fact presented by the entire record before the court. No new or additional evidence in support of or in opposition to any finding, order, determination or decision of the administrative agency shall be heard by the court. The findings and conclusions of the administrative agency on questions of fact shall be held to be . prima facie true and correct.'

A reviewing court cannot reweigh the evidence, make independent determinations of the facts or substitute its judgment for that of the agency even if it believes that the opposite conclusion might be reasonable. [Citations.] Its function is limited to ascertaining whether the administrative agency's findings and decision are against the manifest weight of the evidence. [Citations.] To reverse an agency's decision as against the manifest weight of the evidence, a court must conclude that ' "all reasonable and unbiased persons, acting within the limits prescribed by the law and drawing all inferences in support of the findings, would agree that the finding is erroneous" [citation], and that the opposite conclusion is clearly evident.' [Citation.] It is not sufficient that there are '[m]ere conflicts in testimony' [citation] or that an opposite conclusion might be reasonable [citation]."

■ Our research and that of the parties has revealed no Illinois case law defining what constitutes an "unsafe or unsound practice" in conducting the business of a bank as provided under section 48 of the Act. However, Federal cases do provide some guidance, although in a different statutory and regulatory context.

In the Federal realm, unsafe and unsound banking practices have been defined as conduct deemed contrary to accepted standards of banking operations which might result in abnormal risk or loss to a banking institution or shareholders. (*Northwest National Bank v. United States Department of Treasury Office of Comptroller of Currency* (8th Cir. 1990), 917 F.2d 1111, 1115.) It is significant that this definition does not require actual loss to a bank from the offending practice; rather, it is the *risk* of loss that is the key to a determination of whether a banking practice is unsafe and un-

sound. To require Federal or State banking authorities to wait until actual loss results would seriously detract from the ability of those authorities to protect bank shareholders and depositors.

Examples of unsafe and unsound banking practices in the Federal context include interest-free loans to bank officers and shareholders (see *Groos National Bank v. Comptroller of Currency* (5th Cir. 1978), 573 F.2d 889); conflicts of interest arising from officers and directors receiving commissions from credit life insurance purchased by borrowers (see *First National Bank v. Smith* (5th Cir. 1980), 610 F.2d 1258); and inadequate lending practices (see *First National Bank v. Department of Treasury* (8th Cir. 1990), 911 F.2d 57 (where the bank was charged with failing to obtain adequate credit and collateral information and failing to identify problem loans); *Alliance Federal Savings & Loan Association v. Federal Home Loan Bank Board* (5th Cir. 1986), 782 F.2d 490 (where the savings and loan association was charged with making substandard and speculative loans, poor loan documentation, inadequate security, and inadequate credit checks)).

Self-dealing by bank officers, directors and shareholders has been a particularly difficult problem for bank regulators. Self-dealing has been identified as an unsafe and unsound banking practice because of conflicts created between the interests of the institution and the interests of the individual. Breaches of fiduciary duty by bank officials are inherently dangerous and cannot be considered safe. *Hoffman v. Federal Deposit Insurance Corp.* (9th Cir. 1990), 912 F.2d 1172, 1174.

In the instant case, the hearing officer and the Banking Board found numerous breaches by Running of his fiduciary duty to Tri-State. The self-dealing by Running in connection with the four Robertson loans, the Mashburn-Abaskus transactions, and the use of Tri-State funds to pay his personal debts are apparent from the record. There was more than sufficient evidence to justify the conclusions reached by the hearing officer and the Banking Board. The circuit court erred in reweighing the evidence and making its own determinations of the credibility of the witnesses.

In determining the propriety of the Commissioner's decision, we must not overlook the basics of a banking institution. Stockholders, even though having control and a sizeable investment, cannot be given carte blanche with a bank's assets because by far the largest part of the assets belong to depositors, not owners. If losses are incurred, not only might the shareholder interests be financially damaged, the depositing public is injured. The national

and State banking industries are highly regulated, and justifiably so, as this case illustrates.

Regardless of the circuit court's negative evaluation of Robertson, the documentary evidence sustains the findings of the hearing officer. Even discounting much of Robertson's testimony, it is apparent that Running joined into a risky financial investment and used the bank's resources for this purpose, to the bank's detriment. The evidence clearly indicates conflicts of interest existed, with the bank on one side and Running's personal financial interest on the other. Using Tri-State funds to pay his personal loans, loaning bank funds without adequate credit reports, poorly preparing security interests, and having no prior knowledge of the dubious horse business, combined with Running's self-dealing, constituted egregious conduct and fully justified the Commissioner's actions in Running's removal. The only acceptable conclusion is that the decisions of the hearing officer and the Banking Board were not against the manifest weight of the evidence.

The circuit court is reversed and the Banking Board's order of removal is reinstated.

Reversed; order of the State Banking Board of Illinois reinstated.

STEIGMANN and KNECHT, JJ., concur.